**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                              No. CR 15-0568 JB

JOSE ERIBERTO MARTINEZ,

      Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before the Court on Mr. Martinez' Sentencing Memorandum, filed May 1, 2015 (Doc. 16).  The Court held sentencing hearings on May 15, 2015, August 19, 2015, and October 23, 2015.  The primary issue is whether a sentence of 24 months -- rather than 8 months, or even a sentence at or below the low end of the guidelines range of 18 to 24 months -- is sufficient, but not greater than necessary, to comply with the statutory directives in 18 U.S.C. § 3553(a), when Defendant Jose Eriberto Martinez has been convicted three times, including this case -- one of which was a drug-trafficking offense -- has been previously deported once, and has returned to the United States of America after serving a sentence of 24 months in prison. Because Martinez returned to the United States after serving a 24 month prison sentence, the Court concludes that a sentence of 8 months, or even a sentence at or below the low end of the guidelines range of 18 to 24 months, will not be sufficient to comply with § 3553(a)'s directives. Accordingly, the Court denies Martinez' requests that he be sentenced to 8 months, or at or below the low-end of the guidelines range of 18 to 24 months, and imposes at sentence at the high end of the guidelines range: 24 months, the same sentence he received the last time that he committed the same crime.

## FACTUAL BACKGROUND

The Court takes its facts from the revised Presentence Investigation Report (disclosed June 16, 2015)("PSR").[1]  Martinez was born in El Salvador to Rosa Evelia Martinez, who is deceased, and to Tomas Martinez, age seventy, with whom Martinez does not have contact.  See PSR ¶ 35, at 8.  He has four paternal half siblings and a sister.  See PSR ¶ 36, at 8.  He is not married, but has five children.  See PSR ¶ 38, at 9.  Martinez has a son, Edgar Martinez, with Lizette Salinas, who lives in El Salvador.  See PSR ¶ 38, at 9.  He has three children who were all born in the United States and live with their mother, Elsa Cardena, in Kansas City, Kansas.  See PSR ¶ 38, at 9.  Martinez also has another daughter who lives with her mother, Blanca Zuleima, in Ahuachapán, El Salvador.  See PSR ¶ 38, at 9.  Martinez reports that he has no formal education, and that he is illiterate and cannot read, write, or speak English.  See PSR ¶¶ 43-44, at 10.  His usual occupation is as a restaurant worker, as well as working in construction and in factories.  See PSR ¶ 45, at 10.

As a young man in El Salvador, Martinez worked as an errand boy for the police and for the border patrol.  See PSR ¶ 37, at 8.  He reported that he then worked changing money on the streets for a money exchange business, until he was robbed of the majority of the money he was carrying, which belonged to his boss.  See PSR ¶ 37, at 8.  He then came to the United States to find work and pay off  debt he owed for losing the money.  See PSR ¶ 37, at 8.  Martinez was eventually absolved of the debt, however, when the owner was robbed and killed.  See PSR ¶ 37, at 8.  Martinez attempted to enter the United States about eight times, and at the age of nineteen, he successfully traveled from El Salvador by foot and train, arriving in the United States.  See

---

[1]The United States Probation Office disclosed two earlier PSRs.  See PSR (disclosed April 10, 2015)("April 10th PSR"); PSR (disclosed May 11, 2015)("May 11th PSR").

PSR ¶ 37, at 8.  Martinez worked in Santa Ana, California with his half-brother as a landscaper and in a plastics factory.  See PSR ¶ 37, at 9.  In 1998, Martinez bought a lunch truck and sold food.  See PSR ¶ 37, at 9.  He reports that, while he was working, gangs in the area attempted to collect money from him.  See PSR ¶ 37, at 9.  When Martinez would not give them his money, they attacked and shot him in the arm.  See PSR ¶ 37, at 9.  Martinez reports that he was able to get a gun away from one of the gang members and shoot one.  See PSR ¶ 37, at 9.  Both he and the gang member were transported to the hospital.  See PSR ¶ 37, at 9.  Martinez reports that he later found out that the gang member died.  See PSR ¶ 37, at 9.

Martinez then helped a detective identify the gang members involved in the incident.  See PSR ¶ 37, at 9.  For safety reasons, his family immediately relocated to Kansas City.  See PSR ¶ 37, at 9.  Martinez joined his family there after the hospital released him.[2]  See PSR ¶ 37, at 9.  Martinez reports that he again attempted to enter the United States in 2010.  See PSR ¶ 37, at 9.  According to Martinez, the Zetas[3] Mexican gang threatened him, kidnapped him and demanded $6,500.00 to take him to the United States.  See PSR ¶ 37, at 9.  The only property that Martinez

---

[2]The Court cannot find any information in the PSR or elsewhere explaining why Martinez left the United States after being reunited with his family in Kansas City.  This is a troubling aspect of Martinez' story.

[3]Los Zetas is a Mexican criminal syndicate that the United States has referred to as "the most technologically advanced, sophisticated and dangerous cartel operating in Mexico."  Michael Ware, Los Zetas called Mexico's most dangerous drug cartel, CNN (Aug. 6, 2009), http://www.cnn.com/2009/WORLD/americas/08/06/mexico.drug.cartels/index.html?iref=24hours.  Los Zetas was formed in the 1990s by commandos who had deserted the Mexican army.  See Ware, supra.  Ralph Reyes, the United States Drug Enforcement Agency's chief for Mexico and Central America has stated: "The Zetas have obviously assumed the role of being the No. 1 organization responsible for the majority of the homicides, the beheadings, the kidnappings, the extortions that take place in Mexico."  See Ware, supra.

had was a house in El Salvador, on which his wife[4] got a title loan and sent the money to the Zetas gang.  See PSR ¶ 37, at 9.  Martinez reports that the gang members abandoned him in the desert.  See PSR ¶ 37, at 9.  They then called his wife and asked for more money, purportedly to assist Martinez in crossing into the United States.  See PSR ¶ 37, at 9.  Martinez' wife sent them $800.00.  See PSR ¶ 37, at 9.  Martinez was jailed for re-entry, and on October 27, 2011, the United States District Court for the Western District of Texas sentenced him to 24-months imprisonment.[5]  See PSR ¶¶ 33, 37, at 7, 9.  He was "deported on November 23, 2012, from Houston, Texas."  PSR ¶¶ 5, 33, at 3, 7.  When he was sent back to El Salvador, he had to sign papers giving his house to the lender.  See PSR ¶ 37, at 9.  Martinez was hoping to come back to the United States to work to build a new house.  See PSR ¶ 37, at 9.

Since the time when Martinez initially began illegally entering the United States, he has been convicted three times, including this conviction, and arrested one additional time.  See PSR ¶¶ 22-33, at 5-7.  First, on June 18, 1996, Martinez was arrested for two felony counts of possession for sale of a controlled substance in Orange County, California.  See PSR ¶ 22, at 5.

---

[4]The Court notes that there is an inconsistency in the PSR with respect to Martinez' marital status.  At one point the PSR states that "[t]he defendant reported he is not married but he does have five children."  PSR ¶ 38, at 9.  At another point, however, the PSR states that "the defendant's wife had to get a title loan on the house and send the money" immediately before Martinez' 2010 illegal reentry into the United States.  PSR ¶ 37, at 9.  The Court assumes the PSR's use of the word "wife" here refers to Zuleima -- the mother of Martinez' daughter -- who lives in Ahuachapán, El Salvador.  See PSR ¶ 38, at 9.

[5]The Honorable Danny C. Reeves, United States District Judge for the United States District Court for the Eastern District of Kentucky, who was sitting by designation, sentenced Martinez in this case.  The Court notes that Judge Reeves is generous with his time and sits by designation in border courts.  The Court believes that Judge Reeves has not only sat in the Western District of Texas but also in Las Cruces.  Judge Reeves is experienced in immigration cases and his judgment is worthy of respect.

Martinez was sentenced to 120 days in jail, 36 months of probation, and a fine of $250.00.  See

PSR ¶ 22, at 5.  Regarding Martinez' 1996 conviction, the PSR states:

> The defendant was represented by counsel.  Name used, Jose Heriberto Martinez.
> On June 18, 1996, officers were patrolling near a residence which is known to
> them for narcotics dealing.  Officers pulled into the drive way of the residence
> and observed two men run to the rear of the house.  They were able to locate one
> of the male individuals who was found to be the defendant.  The defendant was
> observed throwing a brown coin sack into the dirt before walking over to the
> officers.  The brown sack was recovered and contained 30 bundles of cocaine, and
> 14 bundles of black tar heroin.  The defendant was placed under arrest and
> booked into custody.

PSR ¶ 22, at 5.  Second, as stated above, on January 29, 2011, the Western District of Texas

convicted and sentenced Martinez to 24 months, with credit for time served, for illegal reentry

into the United States.  See PSR ¶ 23, at 5.  He was placed on a three-year term of supervised

release and deported to El Salvador via Kansas City.  See PSR ¶ 23, at 5.  Regarding this second

conviction, the PSR states:

> The defendant was represented by counsel.  On January 29, 2011, United States
> Border Patrol agents apprehended the defendant on a ranch.  The defendant
> admitted to be in the United States illegally.  He stated he left his hometown in
> Ahuachapán, El Salvador on January 14, 2011, and traveled by bus to the border
> of Guatemala.  On January 28, 2011, the defendant illegally crossed into the
> United States by wading across the Rio Grande River.  The Western District of
> Texas has been notified in regards to the defendant's violation of his supervised
> release, which does not expire until October 25, 2015.  A Transfer of Jurisdiction
> has been initiated by the District of New Mexico on February 25, 2015, and is
> pending.

PSR ¶ 23, at 5-6.  Third, on December 19, 1995, Martinez was arrested for "Trespass: Occupy

property without Consent" in Santa Ana.  PSR ¶ 28, at 7.  Martinez was sentenced to 36 months

of probation and fourteen days in jail with credit for time served, but the United States Probation

Office ("USPO") was unable to locate further documentation surrounding this arrest.  See PSR ¶

28, at 7.  The PSR also notes that Martinez "has also previously been found to be in the United States and deported on November 23, 2012, from Houston, Texas."  PSR ¶ 33, at 7.

On December 21, 2014, United States Border Patrol agents encountered Martinez at a checkpoint on Interstate 10 on a Greyhound Bus going to Los Angeles, California.  See PSR ¶ 5, at 3.  He was questioned as to his citizenship, and admitted that he was a citizen of El Salvador, and that he did not have legal authorization to enter or remain in the United States.  See PSR ¶ 5, at 3.

## PROCEDURAL BACKGROUND

On February 24, 2015, Plaintiff United States of America filed an Information in the United States District Court for the District of New Mexico charging Martinez with Reentry of a Removed Alien in violation of 8 U.S.C. §§ 1326(a) and (b).  See Information at 1, filed February 24, 2015 (Doc. 9).  The Information alleges that Martinez reentered the United States "while an Order of Exclusion, Deportation, and Removal was outstanding[.]"  Information at 1.  On February 24, 2015, Martinez pled guilty, pursuant to a Fast Track Plea Agreement to the one-count Information.  See Fast Track Plea Agreement, filed February 24, 2015 (Doc. 12).

The Court will discuss the procedural background in four sections.  First, it will describe the PSR's sentencing Guidelines calculations.  Second, the Court will discuss Martinez' Sentencing Memorandum and the first sentencing hearing, where the Court rejected the plea agreement.  Third, the Court will discuss the revised PSR, Martinez' Supplement to his Sentencing Memorandum, and the United States' Sentencing Memorandum.  Fourth, the Court will discuss the Court's rejection of the revised plea agreement, and the third sentencing hearing.

1.    __The First and Second PSR__.

The USPO disclosed its first PSR on April 10, 2015.  See PSR (disclosed April 10, 2015)("April 10th PSR").  It is identical to the revised May 11, 2015 PSR (disclosed May 11, 2015)("May 11th PSR"), except that the May 11th PSR makes the following changes:

> PAGE 6 PARAGRAPH: 27 REASON: The North Justice Center in Santa Ana, California provided the case number: 96CS00061.  The case number and the defendant's denial that he was in a relationship with the woman referenced in this paragraph will be included in the revised presentence report.
>
> PAGE 6 PARAGRAPH: 28 REASON: The following information was provided from the Santa Ana Police Department in Santa Ana: Case number: 95CM09110; the defendant was sentenced to 36 months probation and 14 days jail (credit time served) on December 28, 1995.  Further, the arrest on June 21, 1996 appears to be in connection with paragraph 28 and the separate entry regarding the June 21, 1996 incident will be deleted.  This information will be included in the revised presentence report.
>
> PAGE 7 PARAGRAPHS: 29 and 30 REASON: The defendant's denial that these arrests pertain to him will be noted in the revised presentence report.
>
> PAGE 7 PARAGRAPH: 31 REASON: The failure to appear case was dismissed on May 17, 2004.  This information will be included in the revised presentence report.
>
> PAGE 7 PARAGRAPH DELETION: The paragraph regarding the arrest of June 20, 1996 was deleted as it was related to the arrest of June 18, 1996 listed in paragraph 22 of the presentence report.

May 11th PSR at Cover Sheet.

Both the April 10th PSR and the May 11th PSR state that Martinez' base offense level for a violation of 8 U.S.C. § 1326(a) is 8.  See April 10th PSR ¶ 10, at 4; May 11th PSR ¶ 10, at 4. They add 8 levels under U.S.S.G. § 2L1.2(b)(1)(B), because he has previously been convicted of a felony drug trafficking crime, which did not receive any criminal history points.  See April 10th PSR ¶ 11, at 4; May 11th PSR ¶ 11, at 4.  They make a 2-level reduction under U.S.S.G. §

3E1.1(a) and 1-level reduction under § 3E1.1(b) for acceptance of responsibility, for a total offense level of 13.  See April 10th PSR ¶¶ 17-19, at 4; May 11th PSR ¶¶ 17-19, at 4.  They also make the additional 4-level reduction to reflect the plea agreement, resulting in a total offense level of 9.  See April 10th PSR ¶ 19, at 4; May 11th PSR ¶ 19, at 4.

Martinez' past convictions result in 3 criminal history points.  See April 10th PSR ¶¶ 22-24, at 5-6; May 11th PSR ¶¶ 22-24, at 5-6.  Both the April 10th PSR and the May 11th PSR add 2 additional points under U.S.S.G. § 4A1.1(d), because Martinez "committed the instant offense while under a criminal justice sentence as seen in paragraph 23[.]"  April 10th PSR ¶ 25, at 6; May 11th PSR ¶ 25, at 6.  A criminal history score of 5 establishes a criminal history category of III.  See April 10th PSR ¶ 26, at 6; May 11th PSR ¶ 26, at 6.  The April 10th PSR states that, based on a total offense level of 9 and a criminal history category of III, the applicable guideline range is in Zone B of the Sentencing Table, which means that

> the minimum term may be satisfied by (1) a sentence of imprisonment; or (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in USSG § 5C1.1(e), provided that at least one month is satisfied by imprisonment; or (3) a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment according to the schedule in USSG § 5C1.1(e).

April 10th PSR ¶ 53, at 11; May 11th PSR ¶ 50, at 11.  Pursuant to U.S.S.G. § 5D1.1(c), the court "ordinarily should not impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable alien who likely will be deported after imprisonment."  April 10th PSR ¶ 57, at 11; May 11th PSR ¶ 54, at 11.

Both the April 10th PSR and the May 11th PSR state that they have not identified any information "concerning the offense or the defendant which would warrant a departure from the

advisory guideline range."  April 10th PSR ¶ 69, at 13; May 11th PSR ¶ 66, at 13.  They also identified factors that relate to 18 U.S.C. § 3553(a) which bear upon whether a guideline sentence is warranted.  First, they explain that Martinez "has five children that he helps care for."  April 10th PSR ¶ 70, at 13; May 11th PSR ¶ 67, at 13.  Second, they explain that Martinez "reported he was attempting to come to the United States to work and make enough money to buy himself and his family another home."  April 10th PSR ¶ 67, at 13; May 11th PSR ¶ 70, at 13.  Third, they explain that, according to Martinez, "he was shot and wounded by a gang member," and that he "assisted law enforcement in identifying those involved in his shooting."  April 10th PSR ¶ 70, at 13; May 11th PSR ¶ 67, at 13.  Fourth, they explain that Martinez "has previously been convicted of two counts in which he was possessing controlled substances, heroin and cocaine."  April 10th PSR ¶ 70, at 13; May 11th PSR ¶ 67, at 13.  Based upon these factors, and in consideration of 18 U.S.C. § 3553(a), both the April 10th PSR and the May 11th PSR recommend a sentence within the advisory guideline range.  See April 10th PSR ¶ 71, at 13; May 11th PSR ¶ 67, at 12-13.

### 2. Martinez' Sentencing Memorandum and the First Sentencing Hearing.

Martinez filed his Sentencing Memorandum on May 1, 2015.  See Mr. Martinez' Sentencing Memorandum, filed May 1, 2015 (Doc. 15)("Martinez' Sentencing Memorandum"). In his Sentencing Memorandum, Martinez explains that his fast track plea agreement applies a 4-level downward departure under U.S.S.G. § 5K3.1, and that the PSR correctly calculates the resulting offense level and the resulting guideline sentencing range of 8 to 14 months in custody. See Martinez' Sentencing Memorandum at 1-2.  He explains that, under the plea agreement, he has waived his rights to appeal his conviction and the sentence imposed in this case, and that he

has waived the right to ask the Court for a sentence below the sentencing range set forth in the plea agreement.  See Martinez' Sentencing Memorandum at 2.  Martinez asks the Court to accept the plea agreement and impose a sentence of 8 months, at the low end of the guideline sentencing range.  See Martinez' Sentencing Memorandum at 2.

Martinez then makes several factual objections to the PSR.  See Martinez' Sentencing Memorandum at 2-3.  First, he objects to the contention that he was deported in 2001 and requests that the PSR be revised to omit the error.  See Martinez' Sentencing Memorandum at 2.  Second, he takes issue with a number of matters listed in the "Other Criminal Conduct" portion of the PSR.  Martinez' Sentencing Memorandum at 3.  Paragraphs 27, 29, 30, and 31, of the May 11th PSR state:

| 27. 12/18/1995 (Age 27) | Trespass: Occupy Property without Consent; Case No.: 96CS00061 | Santa Ana Police Department, Santa Ana, CA | Records Destroyed |

On December 18, 1995, officers with the Santa Ana Police Department responded to a residence in reference to an individual who was refusing to leave.  A male individual, later identified as the defendant, used the name Eriberto Martinez. The defendant stated he was there to talk to Ms. Reyes, with whom he was in love and he wanted to talk to her and her husband about being with her.  Ms. Reyes stated she did not want to talk to the defendant and had asked him to leave numerous times.  The defendant stated that he would rather go to jail than leave her.  The defendant was placed under arrest and taken into custody.

The North Justice Center in Santa Ana reported the case number too this case was 96CS00061.  The defendant, through counsel, denies he was ever in a relationship with Ms. Reyes.

. . . .

| 29. 04/21/1996 (Age 27) | Hit and Run: Property Damage; Case No.: Unknown | Westminster Police Department Westminster, CA | No records located |

Name used, Jose Heriberto Martinez.  Further documentation was requested but no records could be located.  The defendant, through counsel, denies he was arrested for this offense.

| 30. 04/22/1996 (Age 27) | Hit and Run: Property Damage; Case No.: Unknown | Orange County Sheriff's Office, Santa Ana, CA | No records located |
|---|---|---|---|

Name used, Jose Heriberto Martinez.  Further documentation was requested but no records could be located.  The defendant, through counsel, denies he was arrested for this offense.

| 31. 05/09/1996 (Age 27) | Failure to Appear: Written Promise; Case No.: Unknown | Westminster Police Department, Westminster, CA | 05/17/2004: Dismissed & Records Destroyed |
|---|---|---|---|

Name used Jose Heriberto Martinez.  Further documentation was requested but no records could be located.

May 11th PSR ¶¶ 27-31, at 6-7.  He states that "some of these reflect prior incidents with unknown or ambiguous outcomes," and that he believes that the Bureau of Prisons may treat such matters as pending cases, which would negatively impact his security classification.  See Martinez' Sentencing Memorandum at 3.  Martinez objects to their inclusion in the PSR if dispositions cannot be established by a preponderance of the evidence.  See Martinez' Sentencing Memorandum at 3.  Martinez also "specifically denies that any of these matters . . . involved him at all."  Martinez' Sentencing Memorandum at 3.  Martinez writes:

> He was never in a relationship with the person in Santa Ana, California as indicated in paragraph 27.  He has never been involved in a hit-and-run vehicle accident (PSR at 6, ¶¶ 29-30).  He has not failed to appear in court (PSR at 7, ¶ 31).  And he could not have been the person involved in the incidents reported in paragraphs 32 and 33, which are alleged to have occurred on June 20 and June 21, 1996, respectively.  As reported in paragraph 22 on page 5 of the PSR, Mr. Martinez was arrested on June 18, 1996 and sentenced to 120 days, or four months, in custody on August 9, 1996.  He was in custody from June 18 until approximately October 18, 1996 and could not have committed those offenses. Mr. Martinez asks that, unless proof by a preponderance of the evidence is produced supporting these allegations, these matters be deleted from the PSR.

- 11 -

Martinez' Sentencing Memorandum at 3.

      Martinez emphasizes that, "[a]ccording to the Bureau of Consular Affairs, Department of State, crime and violence in El Salvador are 'critically high.'"  Martinez' Sentencing Memorandum at 4.  He contends that it is worse than that description and that criminal gangs appear to be running the country.  See Martinez' Sentencing Memorandum at 4.  Martinez explains that, in his former neighborhood, the gangs extort protection money, and threaten those that decline to or are unable to pay with death.  See Martinez' Sentencing Memorandum at 4.  He maintains that many of his friends and family members have been killed by these gangs.  See Martinez' Sentencing Memorandum at 4.  According to Martinez, "[i]t is even worse for those who have been deported from the United States, because the gangs think that people coming from this country are coming with their pockets stuffed with money."  Martinez' Sentencing Memorandum at 4.  Martinez contends that the Zeta cartel kidnapped him in Mexico and that he ultimately had to have his partner mortgage his house in El Salvador to buy his release.  See Martinez' Sentencing Memorandum at 4.  He "ended up losing that house, and came to this country to try to rebuild his financial life."  Martinez' Sentencing Memorandum at 4.

      As the factual section sets forth, Martinez explains that, once in the United States, he operated a lunch cart in California, and that he refused to pay a gang protection money, leading to an attack.  See Martinez' Sentencing Memorandum at 5.  According to Martinez, he was injured in that encounter and shot one of the gang members with a gun that he took from one of them.  See Martinez' Sentencing Memorandum at 5.  Martinez explains that he has two children who live in El Salvador and three children who are United States citizens.  See Martinez' Sentencing Memorandum at 5.  Regarding his convictions, Martinez writes:

Mr. Martinez sustained a conviction for possession of a controlled substance for sale in 1996.  PSR at 5, ¶¶ 22, 70.  Mr. Martinez was surprised to learn that he had pleaded guilty to a "possession for sale" offense; he believed that he had entered a guilty plea to a simple possession offense.  This misunderstanding from 19 years ago has caused Mr. Martinez' offense level to rise from level 8 to level 16, rather than to level 12 as would have been the case had the 1996 conviction been what he believed it to be.  This appears to have been the result of a substantial miscommunication between Mr. Martinez and his lawyer in that case.

Mr. Martinez was determined to have a total of five criminal history points, resulting in a criminal history category of III.  PSR at 5 - 6, ¶¶ 22 - 26.  Since 1996, the only conviction Mr. Martinez has sustained was a conviction in 2011 for illegal re-entry into the United States in Del Rio, Texas.

Martinez' Sentencing Memorandum at 5-6.

Regarding the offense's nature and circumstances, Martinez concedes that he understands that he cannot legally enter the United States, but hopes that there may be some relief under immigration law for his situation.  See Martinez' Sentencing Memorandum at 6.  He states that his siblings and children live in and are citizens of, the United States.  See Martinez' Sentencing Memorandum at 6.  He asserts that he was "driven by desperation to leave the deadly violence and criminality of El Salvador."  Martinez' Sentencing Memorandum at 6.  Martinez explains that he was previously sentenced to 24 months in custody for the 2011 re-entry offense in Del Rio, and asks the Court to consider sentencing him "at the low end of the guideline range resulting from the now-common fast track plea agreement which was offered and accepted in this case."  Martinez' Sentencing Memorandum at 6.  Martinez recognizes that imposing a sentence here that is lower than his previous sentence for a similar offense may seem counter-intuitive, but "respectfully asks the Court to consider that the earlier, much longer sentence was likely not imposed in contemplation of the policy considerations which have resulted in the fast track policies which now govern the disposition of these cases."  Martinez' Sentencing

Memorandum at 6.   According to Martinez, that earlier longer sentence is therefore not an appropriate benchmark against which to measure the appropriate sentence in this case.   See Martinez' Sentencing Memorandum at 6-7.  In sum, Martinez asks the Court to accept the plea agreement and to impose a sentence of 8 months -- the low end of the resulting sentencing range after the Court grants the 4-level departure pursuant to the fast-track agreement.  See Martinez' Sentencing Memorandum at 7.

The Court held its first hearing on May 15, 2015.  See Transcript of Hearing (taken May 15, 2015)("May Tr.").[6]  The Court and the parties first addressed several factual objections that Martinez sets forth in his Sentencing Memorandum.  See May Tr. at 2:18-3:15 (Court, Robert). The Court first addressed Martinez' objection to paragraph 33 in the May 11th PSR.  See May Tr. at 3:15-4:1 (Court, Robert).  Specifically, Martinez asserted that he was not, as paragraph 33 of the May 11th PSR indicates, deported on November 15, 2001, from Douglas, Arizona.  See May Tr. at 4:1-4 (Court, Robert).  Martinez contended that he was not deported at that time, that he had been allowed to reenter the United States at that time, and that, given the lack of documentation which the United States has submitted, the deportation did not happen.  See May Tr. at 4:5-6:18 (Court, Robert).  The United States expressed concern that Martinez had entered into a plea with the 2001 date of deportation, but that now he was questioning it.  See May Tr. at 6:19-23 (Torrez).  The United States suggested that everyone step back, and allow Martinez to plead to the other date of deportation -- November 23, 2012, from Houston, Texas.  See May Tr. at 6:19-7:3 (Torrez).  Martinez agreed with the United States that there is no question that there

_____

[6]The Court's citations to the transcripts of the sentencing hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

is a prior deportation, but that it would make sense to clean up the record.  <u>See</u> May Tr. at 7:11-18 (Robert).  The Court also asked the USPO to see if there were additional records or fingerprints demonstrating that the 2001 deportation took place.  <u>See</u> May Tr. at 7:19-6 (Court, Smith).  The Court then addressed Martinez' assertion that he was not involved in the arrests set forth in paragraphs 27, 29, 30, and 31 on pages 6 and 7 of the May 11th PSR.  <u>See</u> May Tr. at 8:6-16:4 (Court, Robert, Smith).  The Court concluded that "we add something under other criminal conduct just saying the following information came from NCIC[7] and police reports," but leave the information in the PSR.  <u>See</u> May Tr. at 10:5-11:1 (Court, Robert, Smith).  The Court and the parties had the following exchange:

> THE COURT:  All right.  Would that -- if I made no finding on those, I know you want them out, but they're showing up on NCIC.  So I don't see any problem with leaving them, but if I indicate I can't find by a preponderance of the evidence that he was involved in those, anything else you want to say on that?
>
> MR. ROBERT:  Only that, if it can't be established a preponderance, it shouldn't be in the Presentence Report, but I understand the Court's decision.
>
> THE COURT:  All right.  Anything else you want to say on that, Mr. Torrez?
>
> MR. TORREZ:  Well, I don't know whether her -- the testimony of the probation officer relating to those facts, findings based on what is an otherwise pretty good source of information, amounts to a preponderance.  So I don't know whether the Court would like to -- we would just proffer that that would be the testimony of the -- of the officer and -- and let the Court decide whether or not that's preponderance or not.
>
> THE COURT:  Well, you're just going to testify that you got this material out of NCIC and police reports, right?

---

[7]The National Crime Information Center ("NCIC") has "been called the lifeline of law enforcement -- an electronic clearinghouse of crime data that can be tapped into by virtually every criminal justice agency nationwide, 24 hours a day, 265 days a year."  <u>National Crime Information Center</u>, Federal Bureau of Investigation, https://www.fbi.gov/about-us/cjis/ncic (last visited April 26, 2016).

> THE PROBATION OFFICER:  Yes, Your Honor.
>
> THE COURT:  All right.  Well, without the records, I think it would be maybe a little difficult for me to go ahead and find by a preponderance, so I'll leave the statement the way it is but leave the material in.  And we've got to figure out this 2001 deportation, but that takes care of your objections, Mr. Robert?
>
> MR. ROBERT:  Yes, Your Honor.

May Tr. at 16:5-17:13 (Court, Robert, Torrez).  Hence, the Court will leave a statement in the PSR that the information in paragraphs 27, 29, 30, and 31 on pages 6 and 7 of the May 11th PSR is from the NCIC, but the Court will add a sentence stating that it cannot find by a preponderance of the evidence, that Martinez committed these crimes.

The Court then discussed the fast track plea agreement.  See May Tr. at 17:14-15 (Court). The Court explained that the plea agreement does not give it enough of a range to adequately reflect some of the § 3553(a) factors, particularly respect for the law and specific deterrence.  See May Tr. at 17:18:1-5 (Court).  The Court stated that, given Martinez' criminal history -- the drug-trafficking offense and the prior re-entry conviction he received in 2011 -- it was inclined not accept the plea agreement.  See May Tr. at 18:5-10 (Court).  The Court asked whether Martinez would like to set forth his argument, or to get the objections and the 2001 deportation issues resolved first.  See May Tr. at 18:9-11 (Court).  Martinez stated that, if the Court is going to reject the plea agreement, "we're not going to go forward with the sentencing today . . . [s]o that's a moot point," but maintained that the totality of the circumstances warrant the Court accepting the plea agreement.  May Tr. at 18:12-19:3 (Court, Robert).  Martinez pointed to the following factors that he contends counsel the Court to accept the plea agreement: (i) Martinez may be eligible for immigration relief, because he was a victim of violent crime when he was operating a lunch counter in California; (ii) he was shot during that incident and is still

concerned; (iii) life in El Salvador is disastrous, and he came to the United States to rebuild a life after losing everything to the Zetas cartel, which is understandable; (iv) three of his children, who are United States citizens, live in Kansas City; and (v) the 24-month sentence in the past is not reflective of what ought to be happening today under Department of Justice policy.  See May Tr. at 19:1-21:11 (Court, Robert).  In sum, Martinez maintained that the 8 to 14 month guideline sentencing range resulting from the plea agreement is more than adequate to accomplish the goals of sentencing.  See May Tr. at 19:1-21:11 (Court, Robert).  He also explained that he was going to ask the Court "to impose the sentence for the supervised release violation either fully or partially concurrently with the sentence that you are going to impose in this case."  May Tr. at 21:6-9 (Robert).

The Court expressed that it seemed unlikely that, the police rented a moving truck, put everything in it, and transported him to Las Vegas, Nevada, after the gang incident in California. See May Tr. at 21:12-23:7 (Court, Robert).  Martinez responded that it was entirely feasible given that, seventeen years ago, local law enforcement did not really have immigration status on their radar.  See May Tr. at 22:8-11 (Robert).  Martinez further maintained that law enforcement at that time had on its mind a person who was in danger after a dangerous gang attacked him. See May Tr. at 22:11-23:7 (Robert).  Martinez explained that, although Martinez did not disclose any of this story to probation when he was deported in 2011, it happened, and he is actively seeking records on it, but that they are difficult to locate.  See May Tr. at 23:3-24:12 (Court, Robert).  The United States then made some brief comments on whether the Court should accept the plea agreement.  See May Tr. at 24:18-25:17 (Court, Torrez).  The United States responded

that, "[u]ntil we clarify this date, I would rather not go forward."  May Tr. at 25:18-19 (Torrez).

The Court then stated:

> Okay.  Well, I will not reject it, but I'm inclined to reject it.  I'll hear from you further, Mr. Robert, at another time when we clear up this 2001.  But I guess I just don't think on the record and the arguments so far that this is going to give me enough of a range to, I think, adequately reflect some of the 3553(a) factors, including specific deterrence given the prior sentence.  So I don't know if that's helpful to you or not, but Mr. Torrez is probably right.  We probably do need to clean up this 2001 deportation and the information that's there.

May Tr. at 25:20-26:6 (Court).

### 3.   The Revised PSR, Martinez' Supplement to his Sentencing Memorandum, and the United States' Sentencing Memorandum.

On May 27, 2015, Martinez entered into a new fast track plea agreement that was essentially identical to the plea executed in connection with the first plea agreement -- i.e., the one the Court indicated at the May 15, 2015 sentencing hearing that it would likely reject.  See Fast Track Plea Agreement, filed May 27, 2015 (Doc. 21).  The USPO disclosed a revised PSR on June 16, 2015.  See PSR at 1.  The cover page to the revised PSR explains the changes made to the report:

> On May 27, 2015, a new Information was filed which corrected the defendant's deportation date to state November 23, 2012.  A revised presentence report is being disclosed to include the updated information.

> PAGE 3 PARAGRAPHS: 1, 2, and 3 REASON: A new Information was filed on May 27, 2015 to correct the deportation date.

> PAGE 6 REASON: A paragraph was before paragraph 27 pursuant to the Court's request during the May 15, 2015 hearing.  The paragraph is in reference to the Other Criminal Conduct section.

> PAGE 7 PARAGRAPH: 33 REASON: Due to the change in the information regarding the defendant's previous deportation, the presentence report was changed and the previous date was removed.

- 18 -

PSR at Cover Page.

Martinez then filed a Supplement to his Sentencing Memorandum on June 18, 2015.  See Mr. Martinez' Supplement to his Sentencing Memorandum, filed June 18, 2015 (Doc. 24)("Supplement").  Martinez argues that "[t]he sentencing range resulting from the fast track plea agreement produces a sentence that is sufficient, but not greater than necessary to serve the aims of sentencing in the criminal justice system."  Supplement at 3.  Martinez explains that, in October, 2011, he was sentenced for a re-entry offense in the Western District of Texas.  See Supplement at 3.  Martinez asserts that his offense level was 17, resulting in a guidelines range of 24 to 30 months, and that he received a sentence at the low end of the guideline sentencing range.  See Supplement at 3.  Martinez argues that there was no fast track plea agreement in that case and that it is likely that there was no fast track program available in that court.  See Supplement at 3.  Martinez further asserts:

> Four days after the filing of the judgment in the 2011 re-entry case in Western Texas, an amendment to U.S.S.G. § 2L1.2 became effective.  Before the amendment, a prior drugs conviction resulting in a sentence of less than 13 months and which did not count for criminal history points yielded a 12 level increase in the guidelines offense level.   U.S.S.G.  §  2L1.2(b)(1)(B)  (2010 version).  Effective as of November 1, 2011, the enhancement was reduced from 12 levels to 8 levels.  It would be appropriate to conclude that the Sentencing Commission recognized that the prior treatment of convictions of that character and age was unreasonably harsh.  Had that conclusion been reached before Mr. Martinez' 2011 re-entry conviction (or had Mr. Martinez been sentenced four days later), the offense level would have been 13, rather than 17.  Even without a fast track plea program, Mr. Martinez' sentencing range would have been 12 months to 18 months.
>
> Had that case been prosecuted here under the current fast track program, there would have been an additional four level reduction in Mr. Martinez' offense level, making the offense level 9.  The guideline sentencing range would have been four to ten months in custody, instead of the 24 months to 30 months range that was applied.

Supplement at 3-4.  Martinez also argues that, four days after Martinez was sentenced, "U.S.S.G. § 5D1.1(c) was also amended to say that '[t]he court ordinarily should not impose a term of supervised release' where the defendant is an alien who would be deported following the service of a custodial sentence."  Supplement at 4.  According to Martinez, he received a three-year term of supervised release in that case, which increased his criminal category in this case, and exposes him to an additional term of imprisonment for the violation of the terms of his supervised release from his re-entry.  See Supplement at 4.

Martinez allows that there is a strong sentiment that a sentence for a subsequent re-entry should be longer than a previous sentence for a similar offense.  See Supplement at 5.  He asserts that "[r]igid application of such a principle essentially institutionalizes disparity in the treatment of similarly situated defendants."  Supplement at 5.  He argues:

> Unwarranted disparity is specifically enumerated in the statute as a relevant sentencing factor. 18 U.S.C. § 3553(a)(6).  Disparity relating to the inconsistent application of fast track programs is recognized as a valid basis for departure or variance.  *United States v. Lopez-Macias*, 661 F.3d 485 (10th Cir. 2011); *United States v. Lopez-Avila*, 665 F.3d 1216, 1219 (10th Cir. 2011).  Acknowledging the difference between the treatment of defendants in the District of New Mexico as compared to other districts is an appropriate way to ameliorate the pernicious impact of that disparate treatment.

Supplement at 5.  Martinez asserts that, to the extent that the Court concludes that the sentencing range resulting from the fast track plea agreement is too low relative to the 2011 sentence, the 2011 sentence is an invalid baseline from which to determine the sentence in this case.  See Supplement at 5-6.  Martinez maintains that the Department of Justice's fast track policy in place in New Mexico is a reasonable response to the issues that re-entry cases present.  See Supplement at 6.  He insists that, with respect to deterrence, economic desperation, and rampant violence often far outweigh the risks of jail in the United States, and that this is particularly true

- 20 -

for Martinez, who comes to the United States from El Salvador, a country riven with criminal violence and economic devastation.  See Supplement at 6.  Martinez contends:

> [T]o base a sentence in the instant case on a sentence in a prior case that was unduly harsh because of a guideline that has been since amended, and because of a reasonable fast track policy, would result in a procedurally and substantively unreasonable sentence, particularly given the diminished deterrent effect such a sentence would have given the defendant's circumstances.

Supplement at 6-7.

Martinez also provides additional information regarding the incident in California in which he was a victim of violent crime and about which the Court expressed concern at the May 15, 2015 sentencing hearing.  See Supplement at 7.  Martinez explains that the California police told him not to say anything to anyone about the incident, because of the danger of violent reprisal by members of the criminal gang that perpetrated the crime of violence against him.  See Supplement at 7.  Martinez further asserts:

> He did not mention it during the 2011 prosecution, possibly because his counsel at the time did not discuss with him the possible impact on both his immigration status and the sentencing in the 2011 case.  Additionally, counsel has spoken with someone who was familiar with Mr. Martinez at the time of the occurrence of the gang's armed attack on Mr. Martinez.  This person confirms that the attack occurred, and that the police and other authorities assisted Mr. Martinez and his family to leave California in order to minimize the danger of attack.

Supplement at 7.  In conclusion, Martinez asks the Court to accept the fast track plea agreement, which provides for a stipulated guideline sentencing range of 8 to 14 months.  See Supplement at 7.  He requests that the Court sentence him at the low end of the sentencing range, to 8 months.  See Supplement at 7.  Martinez also notes that he faces a sentence for the violation of the conditions of the term of supervised release that the Western District of Texas imposed.  See Supplement at 7 n.4.  According to Martinez, the advisory guideline range for that violation is 4

to 10 months.   See Supplement at 7 n.4.   The United States filed its 6-page Sentencing Memorandum on July 2, 2015.   See United States' Sentencing Memorandum, filed July 2, 2015 (Doc. 25)("United States' Sentencing Memorandum").   The United States asks the Court to accept the fast track plea agreement.   See United States' Sentencing Memorandum at 5.   It requests that, in light of the § 3553(a) factors, the Court should sentence Martinez within the guidelines range of 8 to 14 months.   See United States' Sentencing Memorandum at 5.

**4.    The Court's Rejection of the Plea Agreement and the Second and Third Sentencing Hearings.**

The Court held a second sentencing hearing on August 19, 2015.   See Transcript of Hearing (taken August 19, 2015)("Aug. Tr.").   The Court agreed that the revised PSR disclosed on June 16, 2015, dealt with all of Martinez' factual objections, and moved to the question whether it should accept the fast track plea agreement.   See Aug. Tr. at 4:10-12 (Court). Martinez largely stuck to his briefing, asking the Court to accept the plea agreement and to sentence at the low end of the range, both on the new charge and on the supervised release violation.   See Aug. Tr. at 4:13-9:12 (Robert).   The Court then asked the United States to make remarks in support of the plea agreement.   See Aug. Tr. at 9:15-16 (Court).   The United States explained that the plea agreement was made pursuant to the fast track plea program that the United States Attorney's office has authorized and that it believes the plea agreement is in the interests of justice.   See Aug. Tr. at 9:18-24 (Hurtado).   The United States recommended that the Court impose a sentence of 8 months -- the low end of the guidelines range -- for the underlying offense, and a sentence of 4 months as to the violation of supervised release, to be served consecutively.   See Aug. Tr. at 9:25-10:9 (Hurtado).   The United States acknowledged that Martinez previously served 24 months in custody, but contended that it is "pretty rare for

someone who only has one prior immigration law violation to be sentenced to even 8 months[.]" Aug. Tr. at 10:10-13 (Court).  The United States asserted that it therefore "believes that a sentence of 8 months is sufficient, but not greater than necessary to achieve the goals of sentencing as to this particular defendant, and his history and characteristics."  Aug. Tr. at 10:13-18 (Court).

The Court then ruled that, after considering Martinez' case, the briefing, and the sentencing hearings, it would reject the plea agreement, and that Martinez was free to withdraw his plea of guilty, if he wished to do so, and to proceed to trial.  See Aug. Tr. at 11:4-15:4 (Court).  The Court explained that the disparity argument is a difficult one for Martinez to make, because: (i) although the fast track programs have introduced disparities into the system, there are some justifications for that disparity; (ii) fast tracks are not required in each one of the federal judicial districts; and (iii) Booker[8] requires the Court to look at the individual defendant and, in this case, Martinez has a criminal record, comes from El Salvador, and has made numerous attempts to enter the United States.  See Aug. Tr. at 11:13-12:14 (Court).  The Court then explained that Martinez' previous sentence of 24 months did not deter him from re-entering the United States.  See Aug. Tr. at 12:15-13:4 (Court).  With respect to the suggestion that the Court can solve a lot of these problems with supervised release, it explained that it does not use supervised release very often for those individuals being deported.  See Aug. Tr. at 13:13-14:9 (Court).  The Court emphasized that deterrence is an important factor in this case and that the prior sentence did not deter Martinez from coming back.  See Aug. Tr. at 14:10-12 (Court).  The Court concluded by stating:

---

[8]United States v. Booker, 543 U.S. 220 (2005)("Booker").

So I think both on a specific level, respect for the law, he came back rather quickly, he's got a supervised release, and he has this violation as well, trying to arrive at a just punishment, I think there is a number of factors that suggest the range that's being proposed here by this plea agreement doesn't give the Court the flexibility and the ability to achieve a sentence that reflects well the 3553(a) factors. I just think it presents, in this particular case, too low of a range. And so I respect the attorneys and their sentence that they propose, the range that they propose. But I think in this particular case it doesn't give the Court enough of a range to reflect accurately the circumstances here. And so for that reason I will reject the plea agreement.

Aug. Tr. at 14:12-15:2 (Court).

Martinez maintained his plea of guilty, and on September 22, 2015, he pled guilty before the Honorable Steven C. Yarbrough, without the benefit of a plea agreement. See Plea Minute Sheet at 1, filed September 22, 2014 (Doc. 32). The Court then held its third and final sentencing hearing on October 23, 2015. See Transcript of Hearing (taken October 23, 2015)("Oct. Tr."). The parties agreed that all factual objections had been resolved and that they were satisfied that the date in the information now correctly reflected Martinez' 2012 deportation. See Oct. Tr. at 18:17-21:16 (Cairns, Court, Robert). Martinez explained that, without a plea agreement, the guidelines range in this case is 18 to 24 months. See Oct. Tr. at 21:21-22 (Robert). He reiterated his arguments from the briefing and the prior hearings, and asked the Court to impose, in light of the § 3553(a) factors, a sentence at or below this range. See Oct. Tr. at 21:21-37:15 (Court, Robert). The United States then moved for a third level adjustment downward for acceptance of responsibility, to which Martinez did not object. See Oct. Tr. at 38:12-20 (Cairns, Court, Robert). The United States then argued: "Your Honor, the Court has rejected the Rule 11(c)(1)(C) agreement, and that agreement is not binding upon the Court; however, that agreement is binding upon the government, and therefore, I would request

that the Court sentence this defendant consistent with the Rule 11(c)(1)(C) agreement."  Oct. Tr. at 38:22-39:3 (Cairns, Court, Robert).

The Court then stated the sentence.  <u>See</u> Oct. Tr. at 39:5-44:9 (Court).  The Court explained that, in reaching its decision, it reviewed all three PSRs and considered the sentencing guidelines applications.  <u>See</u> Oct. Tr. at 39:9-20 (Court).  The Court explained that, without the Rule 11(c)(1)(C) agreement, the offense level is 13 and the criminal history category is III, producing a guidelines sentencing range of 18 to 24 months.  <u>See</u> Oct. Tr. at 39:23-40:3 (Court). The Court explained that, after rejecting the plea agreement, it concludes "that the resulting guidelines gives the Court a guideline range that the Court believes is sufficient to -- and not greater than necessary to -- to arrive at a -- at a punishment."  Oct. Tr. at 40:25-41:6 (Court). The Court explained that, understanding the dire situation in El Salvador, it did not understand how returning him to El Salvador, sooner rather than later, helps him, and that it therefore did not view that as a significant factor in its § 3553(a) analysis.  <u>See</u> Oct. Tr. at 41:7-12 (Court).  The Court stated that, although it had some doubts as to Martinez' story that he killed a man in self-defense, it "is concerned about him being in the United States and -- even if it was in self-defense, having a violent incident here in the United States."  Oct. Tr. at 41:13-24 (Court).  With respect to the sentence Martinez received in 2011, the Court stated:

> I know that [] the defendant has advanced several reasons as to why that may be an outlier and too high, but regardless of how Judge Reeves got there and whether it could have been something less or a fast-track there would have gotten a less sentence, all those may be true, but the bottle line is that Judge Reeves gave him a sentence of 24 months and it did not deter him from coming back into the United States.

Oct. Tr. at 42:1-9 (Court).

The Court then explained that deterrence is a significant factor and that it needs to look specifically at what has worked in keeping Martinez out of the United States.  See Oct. Tr. at 42:10-13 (Court).  The Court then stated that it concludes that a sentence at the high end of the guidelines range is necessary in this case, given Martinez' criminal history, and the need to promote respect for the law, to provide just punishment, to afford adequate deterrence (both specific and general), and to avoid unwarranted sentencing disparities.  See Oct. Tr. at 42:14-43:16 (Court).  The Court then sentenced Martinez to a term of 24 months incarceration, the same sentence that Judge Reeves gave him in 2011.  See Oct. Tr. at 43:17-21 (Court).  The Court further explained that it would not impose a term of supervised release.  See Oct. Tr. at 43:22-25 (Court).  Martinez objected that "the elevation of deterrence to the -- to the apparent [] exclusion of other [3]553(a) factors is unreasonable and results in a substantially unreasonable sentence and denies Mr. Martinez due process."  Oct. Tr. at 45:3-8 (Robert).  The Court responded:

> All right.  And I've certainly carefully considered Mr. Martinez's situation, and while I do think that, in this particular calculus, I do need to emphasize deterrence, I did try to consider carefully the other circumstances that were advanced of his characteristics, the nature of the crime, and so I certainly tried to consider those, but I did think deterrence in this situation, given his criminal history, as well as the concerning nature of the incident that he advances from 1998 don't justify a variance and don't justify the low sentence that was advanced with the Rule 11(c)(1)(C), so I'll continue to believe that the sentence that the Court has imposed is -- is the correct one to give him and accurately reflects the 3553(a) factors.  All right.  It is ordered that the sentence is imposed as the Court has stated it.

Oct. Tr. at 45:9-25 (Court).  The Court then moved on to sentence Martinez for violating the terms of his supervised release.  See Oct. Tr. at 47:7-10 (Court, Robert).  Martinez pled that he had violated supervision, and the parties agreed that supervision should be revoked.  See Oct. Tr. at 47:11-55:10 (Cairns, Court, Robert).  The Court then sentenced Martinez to a term of

imprisonment of 4 months -- 3 months to run concurrently to the 24-month sentence it had imposed for the underlying crime and 1 month to run consecutively.  See Oct. Tr. at 60:18-61:1 (Court).

## RELEVANT LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section

> 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to considerable deference.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. 338,

349 (2007), as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th Cir. 2008). This presumption, however, is an appellate presumption, and not one that the trial court can or should apply. See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007). Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[9] Guidelines sentence. See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

---

[9]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the Guideline ranges are advisory. Gall v. United States, 522 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory [.]"); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory."). The Court must consider the Guidelines, see Gall v. United States, 522 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 522 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). The Court is not mandated, however, to apply a sentence within the calculated Guidelines range. See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence.   Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures.   The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb.

13, 2008)(Browning, J.).   The Supreme Court recognized, however, that the sentencing judge is

"in a superior position to find facts and judge their import under § 3553(a) in each particular

case."   Kimbrough v. United States, 552 U.S. at 89.   Applying § 3553(a)'s factors, the Court has

concluded that the case of an illegal immigrant who re-entered the United States to provide for

---

The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted).   In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield.   In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances."   Irizarry v. United States, 553 U.S. 708, 710-16 (2008).   A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably.   See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, No. CR 10-1919-002 JB, 2014 WL 3377695, at *20-21 (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

his two children and two siblings was not materially differentiated from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted.   See United States v. Alemendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.).   On the other hand, in United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual degree and, thus, did not warrant a departure, the Court found that a variance was appropriate, because the defendant's military service was "superior and uniformly outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction."  2011 WL 831279, at *14.

## ANALYSIS

In 18 U.S.C. § 3553(a), Congress directs courts to consider numerous factors when imposing a sentence, including deterrence.  Although longer prison sentences may not always yield a significant amount of deterrence or be the most important factor in the § 3553(a) calculation, incarceration serves some deterrence function and is at least one tool in the Court's arsenal to promote deterrence.  Given that Martinez has previously entered the United States illegally and that a 24-month sentence imposed in 2011 did not deter him from re-entering the United States, § 3553(a)(2) suggests that the Court should impose a sentence at the high end of the Guidelines range.  Furthermore, some of § 3553(a)'s other directives to: (i) promote respect for the law; (ii) provide just punishment; (iii) consider the nature and circumstances of the offense and the history and characteristics of the defendant; and (iv) avoid unwarranted sentencing disparities all counsel that the Court should impose a sentence at the high end of the Guidelines range.  Accordingly, the Court will sentence Martinez to 24-months imprisonment.

I.     **THE COURT WILL IMPOSE A SENTENCE AT THE HIGH END OF THE GUIDELINES RANGE TO PROMOTE DETERRENCE.**

Although the Court has considered all of the § 3553(a) factors, deterrence is a particularly significant factor in this case.  At the third sentencing hearing, Martinez objected that "the elevation of deterrence to the -- to the apparent [] exclusion of other [3]553(a) factors is unreasonable and results in a substantially unreasonable sentence and denies Mr. Martinez due process." Oct. Tr. at 45:3-8 (Robert).  The Court carefully considered all of the § 3553(a) factors, but deterrence is an important factor in the calculation for determining Martinez' sentence.

The Court has reviewed the leading research and concluded that the weight of the research indicates that incarceration -- imposing it at all or increasing the amount imposed -- has little to no significant correlation to recidivism.   See, e.g., Lin Song & Roxanne Lieb, Recidivism: The Effect of Incarceration and Length of Time Served 4-6, Wash. St. Inst. for Pub. Pol'y (Sept.1993), available at http://wsipp.wa.gov/ ReportFile/1152/Wsipp_Recidivism–The–Effect–of–Incarceration–and–Length–of–Time–Served_Full–Report.pdf (summarizing available studies on the correlation between incarceration and recidivism); T. Bartell & L.T. Winfree, Recidivist Impacts of Differential Sentencing Practices for Burglary Offenders, 15 Criminology 387 (1977)(outlining the results of a New Mexico-based study and concluding that offenders placed on probation were less likely to be reconvicted than similarly situated offenders who were incarcerated); D.M. Gottfredson, M.G. Neithercutt, J. Nuttfield & V. O'Leary, Four Thousand Lifetimes: A Study of Time Served and Parole Outcomes, Nat'l Council on Crime & Delinquency (1973)(outlining the results of a study of over 100,000 male parolees and finding that similarly situated offenders who served longer periods of incarceration were more likely to

recidivate than those who received shorter periods of incarceration); T. Orsagh & J.R. Chen, The Effect of Time Served on Recidivism: An Interdisciplinary Theory, 4 J. Quant. Criminology 155 (1988)(concluding that similarly situated robbery convicts' recidivism rates rose with rising length of incarceration, while burglars and some other criminals had a "sweet spot" length of incarceration -- 1.2 to 1.3 years for younger offenders and 1.8 years for older offenders -- deviations from which increased recidivism). This trend obtains even for white-collar criminals. See David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995).

Thus, specific deterrence is a suspect ground for increasing incarceration, except insofar as the offender will be prevented -- though not "deterred" in the usual sense -- from committing additional crimes while in custody for the longer time period. This concept, however, is distinct; it is referred to as incapacitation, and academics do not usually consider it to be a subcategory of specific deterrence. Professor Daniel Nagin explains:

The distinction between incapacitation and deterrence is also important for policy. Crime prevention by incapacitation necessarily requires higher imprisonment rates and the attendant social costs. By contrast, if crime can be deterred from occurring in the first place, there is no perpetrator to punish. As a consequence, crime prevention by deterrence does not necessarily involve a trade-off between crime rates and imprisonment rates.

Daniel S. Nagin, Deterrence: A Review of the Evidence by a Criminologist for Economics, 2013 Annual Rev. Econ. 5:83, 84. Both specific deterrence and incapacitation are, of course, valid considerations in sentencing, and the difference between the two may be more important to academics than to courts. Courts are bound to impose sentences consistent with 18 U.S.C. § 3553(a), and both considerations -- specific deterrence and incapacitation -- are reflected in the same two § 3553(a) factors: (a)(2)(B)'s mandate "to afford adequate deterrence to criminal conduct" and (a)(2)(C)'s mandate "to protect the public from further crimes of the defendant." The Court concludes that specific deterrence is embodied more by (a)(2)(B) than (a)(2)(C), while incapacitation is embodied more by (a)(2)(C) than (a)(2)(B), but both statutory provisions support both considerations, and if Congress did not care to separate them, the Court must address them both when sentencing a defendant. Thus, the Court must still

consider specific deterrence when sentencing, because Congress demands it; prevailing research simply indicates that alternatives to incarceration are generally more effective on this front.

United States v. Courtney, 2014 WL 7472975, at *32 n.13 (D.N.M. Dec. 15, 2014)(Browning, J.).

In addition to specific deterrence, however, the Court must also concern itself with general deterrence.  See United States v. Corchado-Aguirre, 2015 WL 10383207, at *28 (D.N.M. Aug. 31, 2015)(Browning, J.).  Although "lengthy prison sentences" may not deter a particular defendant, increasingly longer prison sentences serve a general deterrent function, thereby deterring others from committing a similar crime.  Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 Crime & Justice 199, 201 (2013)(stating that increasingly longer prison sentences can have appreciable deterrent effects when defendants at the beginning face a relatively shorter sentence).  See Roger Warren, Evidence-Based Practice to Reduce Recidivism: Implications for State Judiciaries, National Center for State Courts 24-25 (2007)(observing that the current sentencing policies reflect the goal of general deterrence); Mark W. Lipsey & Francis T. Cullen, The Effectiveness of Correctional Rehabilitation: A Review of Systematic Reviews, 3 Ann. Rev. L. & Soc. Sci. 299 (2007)(observing that the existence of a criminal justice system that threatens wrongdoers with arrest and punishment deters many to refrain from crime, when they would likely break the law if there were no risk of detection and penalty).  Lipsey and Cullen state: "Our focus here, however, is not on the nature and effects of that general deterrent effect but, rather, on what is often called specific deterrence."  Lipsey & Cullen, supra, at 299. Section 3553(a) does not direct the Court to consider "specific" deterrence; it directs the Court to consider "deterrence," which includes both specific deterrence and general deterrence.  United

States v. Corchado-Aguirre, 2015 WL 10383207, at *28.  Even if the specific deterrence may be negligible, the Court can still further the goal of promoting general deterrence through the imposition of prison sentences.

The Court has previously described how the literature largely demonstrates that incarceration serves a general deterrent function.

> There is, however, comparatively more support for incarceration's general-deterrence value.  An economic model of crime would have individuals committing crimes only when the benefit to the individual of committing the crime ($f$, for "fruits") outweighs the product of the likelihood of getting caught and brought to justice ($c$, for "certainty") multiplied by the detrimental impact of the punishment on the individual ($s$, for "severity").  If $f > c \bullet s$, the individual will commit the crime, and if $f < c \bullet s$, the individual will not commit the crime.  The Court notes that this theory is not fully workable as written; several factors -- many of which would vary from person to person -- would need to be established. For example, $s$ and $f$ would have to be put into the same units.  Commonly, $s$, the punishment for a crime, starts out in units of months of incarceration; $f$, the crime's benefit to the criminal, often starts out in units of dollars.  A conversion factor would have to be established that essentially asks how much an individual would have to be paid to spend a month in prison.  This conversion factor would likely vary from person to person, both on the basis of idiosyncratic personal preferences and for rational, predictable reasons, e.g., an 80-year-old man with millions of dollars might be less apt to trade prison time for money than a 30-year-old without a cent to his name.  Even a single person likely has more than one conversion factor, which marginally fluctuates over the number of months of incarceration involved; for example, there are often immense social and reputational costs to a person for serving his or her first month in prison -- i.e., for being convicted and incarcerated at all -- but these costs are for the most part one-time-only, and do not double or triple upon serving two or three months in prison. The model would also have to account for: (i) the possibility of being arrested but not convicted, which might entail social and reputational costs, and even some jail time; (ii) the possibility of being suspected but not arrested, which may entail social and reputation costs; and (iii) the uncertainty, at the time the crime is committed, of what the exact punishment will be if convicted.   These "intermediate" outcomes -- between the polar outcomes of being convicted, on one hand, and getting away scot free, on the other -- necessitate transforming the right-hand side of the model formula into an integral, in which the various possible outcomes are assigned a probability, their detrimental impact multiplied by that probability, and each possible outcome's consequent product added together to obtain a final sum, which represents $c \bullet s$.  Analogous issues exist on

the left-hand side of the formula -- the expected value of committing the crime.  It is often not clear before committing the crime how much money -- or other non-monetary benefit, which can then be assigned a monetary equivalent -- will be earned by committing the crime, and, thus, the various possibilities and their corresponding likelihoods must be integrated.

None of these snags is fatal to the economic model; they just make the model's inputs difficult to obtain, and, in some cases, practically unknowable.  The model is theoretically sound, and accurately describes how an informed, rational actor would treat the decision whether to commit a crime.  Even though most criminals are not, themselves, "informed, rational actors," one would expect that their behavior would, on average, reflect the rational pursuit of incentives, i.e., individuals who should not rationally commit crimes will commit them at roughly the same rate that individuals who "should" rationally commit crimes refrain from committing them, and thus the irrationalities in both directions cancel out, resulting in net rational behavior.  Thus, under the economic model, all Congress has to do to root out crime is to ensure that the crime's punishment and detection rate are sufficiently high to greatly outweigh the average fruits of the crime.   This end can be effectuated equally well with either severity of punishment or certainty of detection, as a proportional increase to either has the same effect on the right side of the equation.

The model, however, does not work in the real world; it has been falsified by empirical research.  The model is dead, and facts, not theory, killed it.  If the model held true in the real world, doubling the punishment severity of a crime would deter the same portion of potential criminals as doubling the certainty of detection, and halving a crime's punishment would galvanize the same number of new criminals and halving the detection rate.  For example, consider a crime with a certainty of 20% and a severity of 10 years, and assume that 100 people commit this crime.  Now assume that the certainty was raised -- by way of increased resources devoted to police, investigation, prosecution, etc.—to 40%.   The number of people who commit the crime would go down from 100 to $x$.  This figure, $x$, is not a predictable number, i.e., it is not necessarily 50, because to determine $x's$ value one would have to know more about $f$, and where $c \cdot s$ stood in relation to it both before and after the certainty modification.  Now assume, instead, that the certainty was left at 20% but the punishment was raised from 10 years to 20 years.  The number of people who commit the crime would again go down from 100 to $x$, and, although $x$ would still be an unpredictable number, it would be the same number as the number of people who committed the crime when the detection rate was doubled.

An avalanche of criminological studies have determined that this theoretical symmetry between severity of punishment and certainty of detection does not exist in the real world.  See Isaac Ehrlich, Participation in Illegitimate

Activities: A Theoretical and Empirical Investigation, 81 J. Pol. Econ. 521, 544–47 (1973)(finding that the certainty of punishment was a more important indicator than severity in deterring murder, rape, and robbery); Harold G. Grasmick & George J. Bryjak, The Deterrent Effect of Perceived Severity of Punishment, 59 Soc. Forces 471, 472 (1980)(reviewing twelve deterrence studies and explaining that "nearly all these researchers conclude that perceived certainty of legal sanctions is a deterrent, [while] only one (Kraut) concludes that perceptions of the severity of punishment are part of the social control process"); Jeffrey Grogger, Certainty v. Severity of Punishment, 29 Econ. Inquiry 297, 304 (1991)(studying California arrestees and concluding that "increased certainty of punishment provides a much more effective deterrent than increased severity" and that a "six percentage point increase in average conviction rates would deter as many arrests as a 3.6 month increase in average prison sentences"); Steven Klepper & Daniel Nagin, The Deterrent Effect of Perceived Certainty and Severity of Punishment Revisited, 27 Criminology 721, 741 (1989)(surveying graduate students about tax evasion scenarios and finding that certainty of punishment is an effective deterrent); Daniel S. Nagin, Criminal Deterrence Research at the Outset of the Twenty–First Century, 23 Crime & Just. 1, 13 (1998)(reviewing the literature and concluding that "cross-sectional and scenario-based studies have consistently found that perceptions of the risk of detection and punishment have negative, deterrent-like associations with self-reported offending or intentions to offend"); Daniel S. Nagin & Greg Pogarsky, An Experimental Investigation of Deterrence: Cheating, Self–Serving Bias, and Impulsivity, 41 Criminology 167 (2003)(testing whether students would cheat on a trivia quiz to earn a cash bonus and finding that cheating decreased when the certainty of detection was higher but not when the perceived severity of punishment increased); Ann Dryden Witte, Estimating the Economic Model of Crime with Individual Data, 94 Q.J. Econ. 57, 79 (1980)(studying men released from the North Carolina prison system and demonstrating that "a percentage increase in the probability of being punished has a relatively larger effect on the number of arrests or convictions than does a percentage increase in the expected sentence"); Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research 47 (1999); Robert Apel & Daniel S. Nagin, General Deterrence: A Review of Recent Evidence, in Handbook on Crime and Criminal Justice (Michael Tonry ed.)(2011); Alfred Blumstein & Daniel Nagin, The Deterrent Effect of Legal Sanctions on Draft Evasion, 29 Stan. L. Rev. 241, 269 (1977)(studying draft evasion and finding a significant negative association between the probability of conviction and the draft evasion rate, leading the authors to conclude that their "findings are consistent with the work of other investigators who have argued that the certainty of punishment has a stronger deterrent effect on crime than the severity of punishment"); Aaron Chalfin & Justin McCrary, Criminal Deterrence: A Review of the Literature, J. Econ. Literature (forthcoming).  Studies universally find that certainty of punishment has a far greater deterrent effect than severity of punishment. It is difficult to pin down the extent to which real-world (empirical)

findings deviate from the one-to-one rate predicted by the economic model -- i.e., whether certainty is twice as important, three times as important, or ten times as important—as it appears to differ in different contexts.  Interestingly, studies also agree that another factor, which is entirely absent from the economic model, works to determine deterrence: the immediacy, or celerity, with which the crime is detected and the punishment meted out.  The above studies generally find that both certainty and celerity have a greater impact on deterrence than severity.

It is not clear why certainty is so much more effective than severity at deterring criminal behavior; as is the case in many contexts, empirical studies can identify the "what" but not the "why."  It is even less clear why celerity plays any role in a potential criminal's decision.  The Court suspects that the average street-level potential criminal is more well-informed about the likelihood of getting caught, and the quickness with which he will be caught, than he is about the sentence he will receive.  From there, the potential criminal uses the information he has on hand to make his decision, and largely disregards the impact of severity, rather than trying to seek out specific information.  Drug trafficking defendants, aliens returning after being deported, and Indians off the reservation are often shocked at the severity of federal sentences as compared to prior sentences they may have received in state and tribal systems; in the Court's experience, most federal defendants have no idea how harsh federal sentences are, which would obviously prevent them from acting as an effective deterrent.

What is clear, however, is that severity of punishment continues to have some deterrent effect -- albeit less than it would were the universe of potential criminals an overall rational bunch.  See, e.g., Daniel S. Nagin, Deterrence: A Review of the Evidence by a Criminologist for Economists, 2013 Annual Rev. Econ. 5:83, 86–88, 97–98 (2013).  It also seems likely that the behavior of sophisticated potential criminals would hew more closely to the economic model than that of unsophisticated, street-level criminals.  Thus, general deterrence remains an important consideration . . . .

United States v. Courtney, 2014 WL 7472975, at *32 n.13.  See United States v. Luna–Jasso, 2015 WL 1006390, at *15-18 (D.N.M. Feb. 19, 2015)(Browning, J.)(footnote omitted) (concluding that a Guidelines sentence would have a greater deterrent effect than the sentence that the defendant requested).  General deterrence thus remains an important consideration, especially in cases like this one, where the defendant has reason to suspect, based on having

served a 24-month sentence in the past, that the punishment would increase with this particular offense.

Furthermore, Warren's alternative to deterring crime through incarceration is to institute various rehabilitation and prevention programs.  See Warren, supra, at 33.  Warren does not suggest that the Court can further deterrence by reducing prison sentences altogether and doing nothing more.  According to his research, courts can further deterrence through intense rehabilitation and prevention programs.  See Warren, supra, at 32-33.  Without those programs available in this instance, however, Martinez cannot show how the Court can further deterrence without incarceration.  For example, given that Martinez will be deported immediately after he serves his sentence, he will not be eligible for any programs on supervised release that might help him avoid reentering the United States for economic reasons or otherwise.  Indeed, it is hard to imagine what such a program would look like, unless it was more aid to El Salvador or cash payments to its citizens.  Obviously, these programs require the will of the political branches, and the sentencing court has very little ability to factor such nonexistent programs -- or even existing programs -- into its sentencing calculation.

As a result, the Guidelines advise that sentencing courts should not ignore "unsupervised" supervised release.  While some judges impose supervised release in sentences like this one, the Court has always thought such an approach is a bit like kicking the can down the road, postponing the tough decision on what to do with an alien who continues to enter the United States illegally.  The Court has not adopted that approach.  The Court believes that it is more appropriate to bite the bullet and devise an appropriate sentence now for the crime and defendant before the Court.  It thinks it should do what the Guidelines recommend and not

impose supervised release, rather than saying someone will punish the defendant severely -- maybe -- next time.

While parts of the article Deterrence in the Twenty-First Century suggest that longer prison sentences do not achieve a significant amount of deterrence, they do not indicate that longer prison sentences yield no general deterrent effects at all.  See Nagin, Deterrence in the Twenty-First Century, supra, at 230.  Rather, the article argues that the marginal deterrence from an incrementally longer sentence is not great enough to counterbalance the increased social and economic costs involved in incarcerating a person for that greater length of time.  See Nagin, Deterrence in the Twenty-First Century, supra, at 201.  Scholars concede that "California's third strike provision," which imposes substantially higher prison sentences for three-time offenders, "does indeed have a deterrent effect."  Nagin, Deterrence in the Twenty-First Century, supra, at 230.  Nagin argues only that, "on the basis of a cost-benefit analysis, [] the crime-saving benefits are so much smaller than the increased costs of incarceration . . . ."  Nagin, Deterrence in the Twenty-First Century, supra, at 230.  The political branches -- not the courts -- should address any argument whether to incarcerate or not incarcerate on the basis of cost.  If incarceration can achieve more deterrence, the court should not refuse to incarcerate because of costs.  Any argument that the marginal deterrence does not justify the cost should be made to Congress, who has the power to change the factors that judges may consider when imposing sentences.[10]

Nagin's article supports the understanding that increasing the length of a defendant's sentence can have a material deterrent effect.  Specifically, he argues that increased "increments in short sentences do have a material deterrent effect."  Nagin, Deterrence in the Twenty-First

---

[10]This argument can also be properly made to the Sentencing Commission.  See United States v. Vigil, 832 F. Supp. 2d 1304, 1324-26.

Century, supra, at 231.  See Nagin, Deterrence in the Twenty-First Century, supra, at 201 (stating that, in contrast, "there is little evidence that increases in the length of already long prison sentences yield general deterrent effects that are sufficiently large to justify their social and economic costs").  His compilation of the research reveals that there are diminishing marginal deterrent returns to increasing sentence length.  See Nagin, Deterrence in the Twenty-First Century, supra, at 229-32.  One can compare the marginal utility of lengthier prison sentences to the law of diminishing marginal utility.  The law of diminishing marginal utility is an economic concept holding that, as a person increases consumption of a product, there is a decline in the marginal utility that person derives from consuming each additional unit of that product. Kemezy v. Peters, 79 F.3d 33, 35 (7th Cir. 1996)(Posner, J.)(applying the principle to a punitive damages issue and arguing that the "losing $1 is likely to cause less unhappiness (disutility) to a rich person than to a poor one"); United States v. Valencia, 2015 WL 9703436, at *40 n.23 (D.N.M. Dec. 31, 2015)(Browning, J.)(describing the theory of diminishing marginal utility and observing that a "defendant making $1,000,000.00 per year could likely weather a 50-percent-of-total-income fine much more comfortably than a defendant making $20,000.00 per year, even though the two fines, as a fraction of income, are the same").  For example, the first plate of food one eats at a buffet is very good.  Once that person's hunger has been somewhat sated, however, the person's enjoyment of the second plate of food significantly diminishes.  If this person continues eating, he or she would eventually reach a point at which an additional plate of food would provide no utility.

Nagin's compilation of research suggests that prison sentences may abide by the same principle.  See Nagin, Deterrence in the Twenty-First Century, supra, at 231.  Nagin agrees that

"increments in short sentences do have a material deterrent effect on a crime-prone population." Nagin, Deterrence in the Twenty-First Century, supra, at 231.  Lengthier sentences may continue to provide increased marginal deterrence up to a point at which the increased deterrent value levels.  See Nagin, Deterrence in the Twenty-First Century, supra, at 231.  Accordingly, research strongly indicates that increases in sentence length have at least some general deterrent effect -- especially for criminals facing shorter sentences.  The Court has arrived at this conclusion on multiple occasions, determining that the "severity of punishment continues to have some deterrent effect -- albeit less than it would were the universe of potential criminals an overall rational bunch."  United States v. Courtney, 2014 WL 7472975, at *32 n.13 (citing Daniel S. Nagin, Deterrence: A Review of the Evidence by a Criminologist for Economists, 2013 Annual Rev. Econ. 5:83, 86-88, 97-98 (2013)).  See United States v. Luna-Jasso, 2015 WL 1006390, at *15-18.

Although a longer sentence may not be necessary to deter all defendants in all situations, it is one of the few tools at the Court's disposal to encourage deterrence.  See United States v. Corchado-Aguirre, 2015 WL 10383207, at *18.  "The Court has no luxury to ignore the statute's factors, because Congress has mandated the Court to consider deterrence in crafting an appropriate sentence.  See 18 U.S.C. § 3553(a)(2)(B).  The Court must, thus, use the deterrent tools available to it in crafting sentences."  United States v. Corchado-Aguirre, 2015 WL 10383207, at *18.  The Court cannot properly select a different method to deter crime based on its own policy evaluation and ignore the tool that Congress has provided to promote deterrence: incarceration.

Moreover, it appears that a longer prison sentence will effectively deter Martinez in particular from reentering the United States.  Even if incarceration may not decrease recidivism rates at large, it may impact specific individuals based on their particular characteristics.  See Lipsey & Cullen, supra, at 302 (stating that "[s]imple recidivism rates are largely a function of the input characteristics of the respective offenders, especially risk characteristics such as prior offense history, age, and gender").  Martinez has a history of entering or attempting to enter the United States illegally.  See PSR ¶¶ 22-33, at 5-7.  He served 24 months in prison and was deported on November 23, 2012.  See PSR ¶ 33, at 7.  This sentence suggests that at least another 24-month sentence is needed to discourage Martinez from entering the United States illegally, especially knowing that, if he ever returns, he would likely face a higher sentence.  Moreover, the Court is imposing the same length of sentence that the Western District of Texas imposed.  In a situation where the defendant has not demonstrated any situational differences between his last reentry and this reentry, or, as here, the reasons are even less compelling in this case, the Court has no sound reason to conclude that a shorter sentence will deter him now, when a 24-month sentence did not permanently deter him in the past.  Accordingly, § 3553(a)'s deterrence objective suggests that the Court should impose a sentence at the high end of the guidelines -- the same sentence he received last time.

## II.    THE REMAINING § 3553(a) FACTORS INDICATE THAT THE COURT SHOULD IMPOSE A SENTENCE AT THE HIGH END OF THE GUIDELINES RANGE.

In addition to promoting deterrence, § 3553(a) directs courts to promote respect for the law and provide for just punishment.  See 18 U.S.C. § 3553(a)(2)(A).  Martinez has been deported once before in 2012 and will be deported again after he serves his sentence in this case.

He has three criminal convictions, including this one.  Moreover, each time Martinez enters the United States, the United States devotes valuable resources to arresting him, prosecuting him, and deporting him.  By continuing to illegally enter the United States, Martinez disregards the law and the resources that the United States devotes to upholding the law.  Because this is conviction is Martinez' second immigration conviction, a longer sentence -- or in this case the same sentence that he received in 2011 -- is necessary to promote respect for the law and to provide a just punishment.  See United States v. Corchado-Aguirre, 2015 WL 10383207, at *28.  Accordingly, § 3553(a)(2)(A) suggests that the Court should impose a sentence at the high end of the Guidelines range.

Regarding the need to protect the public, the Court is concerned about Martinez' drug trafficking conviction, his prior immigration conviction and deportation in 2012, and the fact that he killed someone in the United States -- even if, as he relates, he did so in self-defense.  This factor therefore also suggests that the Court should impose a sentence at the high end of the Guidelines range.   Under § 3553(a)(1), the Court must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  Martinez asks the Court to remember the violent situation occurring in El Salvador in considering his characteristics and the circumstances surrounding the offense.  See Martinez' Sentencing Memorandum at 4-6.  He asserts that he was "driven by desperation to leave the deadly violence and criminality of El Salvador."  Martinez' Sentencing Memorandum at 6.  While the Court is sympathetic to the situation in El Salvador, it is not sure how returning Martinez to El Salvador sooner -- rather than later -- helps him.  The Court therefore does not view this as a significant factor in its § 3553(a) analysis.  In the end, while this fact -- the

dangerous situation in El Salvador -- is sad, it does not put downward pressure on the sentence. Furthermore, while at one point he asserts that he was "driven by desperation to leave the deadly violence and criminality of El Salvador," Martinez' Sentencing Memorandum at 6, he also states that he "ended up losing that house, and came to this country to try to rebuild his financial life," Martinez' Sentencing Memorandum at 4.   Moreover, while Martinez refers generally to the dangerous situation in El Salvador, it appears that his primary reason for returning to the United States after being deported in 2012 was to work to build a new house.   See PSR ¶ 37, at 9.   In other words, he entered the United States this time for largely economic reasons.   See Martinez' Sentencing Memorandum at 4.   He came here to get money and to build a house for his family. Consequently, Martinez entered the United States for the same reason that many defendants -- particularly from Mexico -- that this border Court sentences each year enter the country: to make money.   In many ways, Martinez is no different than the thousands of Mexicans who come to the United States for better jobs.   In other words, there is nothing in the offense's nature and circumstances that counsels for a variance, and Martinez' character -- coming to the United States for largely economic reasons -- also does not counsel much, if at all, for a variance.

Next, pursuant to § 3553(a)(6), the sentence "avoid[s] unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."   18 U.S.C. § 3553(a)(6).   Martinez asserts that, to the extent that the Court concludes that the sentencing range resulting from the fast track plea agreement is too low relative to the 2011 sentence, the 2011 sentence is an invalid baseline from which to determine the sentence in this case.   See Supplement at 5-6.   Martinez maintains that the Department of Justice's fast track

policy in place in New Mexico is a reasonable response to the issues presented by re-entry cases.

See Supplement at 6.  Martinez contends:

> [T]o base a sentence in the instant case on a sentence in a prior case that was unduly harsh because of a guideline that has been since amended, and because of a reasonable fast track policy, would result in a procedurally and substantively unreasonable sentence, particularly given the diminished deterrent effect such a sentence would have given the defendant's circumstances.

Supplement at 6-7.

The Court agrees that Congress was and is comfortable with sentencing disparities between Fast-Track eligible and non-fast track eligible defendants.  See United States v. Duarte-Hurtado, 295 F. App'x 273 (10th Cir. 2008).  The Court does not, however, give Martinez a higher sentence simply to correct any such disparity.  The Court is not imposing a 24-month sentence solely to match the sentence that the Western District of Texas imposed, where there was likely no fast track plea policy in 2011.  The Court merely observes that a 24-month sentence avoids any unwarranted disparities among defendants with similar records who have been found guilty of similar conduct, thereby complying with the precedent from both the Ninth and Tenth Circuits.  In United States v. Gonzalez-Zotelo, the defendant's original Guidelines range was 63 to 78 months.  See 556 F.3d at 738.  The United States District Court for the Southern District of California first found that the criminal history over-represented the defendant's criminal history and departed downwards, resulting in a new range of 51 to 63 months imprisonment.  See 556 F.3d at 738.  Despite this new range, the court sentenced the defendant to 30 months imprisonment solely to reduce sentencing disparities between the defendant, who was not participating in the fast track program, and another fast-Track eligible defendant who had committed a similar crime.  See 556 F.3d at 738.  The Ninth Circuit held that

the Southern District of California erred by imposing a significantly lower-than-Guidelines sentence solely to reduce a sentencing disparity that Congress had found to be warranted.  See 556 F.3d at 739-41.

The Court does not commit the same error that the Ninth Circuit reversed in United States v. Gonzalez-Zotelo.  First, the Court notes that it does not impose a 24-month sentence to reduce sentencing disparities between Martinez and other defendants who are not eligible for the fast track program, like the Southern District of California did in United States v. Gonzalez-Zotelo.  See 556 F.3d at 738.  Instead, the Court relies on numerous other § 3553(a) factors to reach its conclusion that it should impose a 24-month sentence.  Accordingly, it is not rejecting or disagreeing with Congress' approval of fast-track plea bargaining programs.  Second, the Southern District of California had to depart downward 21 to 33 months to reach its sentence. See 556 F.3d at 738.  The Ninth Circuit in United States v. Gonzalez-Zotelo reversed the Southern District of California's downward departure.  See 556 F.3d at 741.  In contrast, the Court's sentence of 24-months is a Guidelines sentence.  The Court makes no departures or variances to match Martinez to non-fast-track eligible defendants.  Notably, the Court makes no departures or variances to match the Western District of Texas' sentence, where there was no fast track plea policy at the time.  If the Court wanted to reduce sentencing disparities between the Western District of Texas' 2011 sentence and the Court's 2016 sentence, the Court would likely need to impose a higher sentence, considering that Martinez has re-entered the United States in spite of the 24-month sentence and is pleading guilty to a new criminal offense.  Instead, the Court relies on the § 3553(a) factors in the aggregate to arrive at its 24-month sentence.

Similarly, in United States v. Duarte-Hurtado, the Tenth Circuit affirmed the Court for refusing to vary the defendant's sentence solely to match defendants in the fast track program. See 295 F. App'x at 276. Although the Court varied from the defendant's Guidelines sentence, it did so on the basis of the defendant's particular circumstance and concluded that the § 3553(a) factors in the aggregate suggested that a below-Guidelines sentence was appropriate. See 295 F. App'x at 278-9. The Tenth Circuit described the Court's approach:

> Next, it is evident the district court carefully weighed each of the circumstances presented, together with the § 3553(a) factors, in determining whether to grant a variance, and that one of the sentencing factors it believed tipped the balance in favor of granting the variance was § 3553(a)(6). In applying this factor, the district court explained that a sentence of forty-one months, at the low end of the Guidelines range, would not reflect the same length of sentence received by people who committed similar crimes and have similar records to Mr. Duarte-Hurtado. It then concluded that in "[t]aking into consideration this factor, as well as the other variance factors . . . discussed," it believed "a sentence of 36 months balances these factors best." R., Vol. 1, Doc. 31 at 30. Thus, it is clear no procedural error occurred. Further, under *Smart*, we may not examine the weight assigned to any one factor in determining the substantive reasonableness of Mr. Duarte-Hurtado's sentence, and, instead, give due deference to the district court's decision the § 3553(a) factors, on a whole, justified the extent of the variance given. *See* 518 F.3d at 808.

United States v. Duarte-Hurtado, 295 F. App'x at 278. Like the Court did in United States v. Duarte-Hurtado, it again determines that the § 3553(a) factors, on a whole, justify the 24-months Guidelines sentence it imposes.

Furthermore, to determine whether "unwarranted sentencing disparities" exist, the Court must look beyond sentences that New Mexico federal courts impose, and also consider sentences that courts along the border and across the county impose. Looking exclusively at sentences that New Mexico federal courts impose is too narrow, because New Mexico sentences may be anomalous when compared to a broader sample. As evidence that the Court's sentence avoids

irrational disparities, the Court notes that the Western District of Texas gave Martinez a 24-month sentence when he had only a single prior conviction.

By not accepting the Fast Track Plea Agreement here, and sentencing Martinez to 8 months or to a sentence at or below the low end of the guidelines range of 18 to 24 months, the Court is also not creating an unwarranted disparity with those who are sentenced under the "nationwide" Fast Track Program.   The Court looks beyond the District of New Mexico to determine whether a sentencing disparity exists.   The Court has described the history of the fast-track policies previously:

> In the PROTECT Act of 2003, [Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003, Pub. L. No. 108-21, 117 Stat. 650 (2003),] Congress gave the U.S. Attorney for each district the authority to create a fast-track or early disposition program for criminal cases.   [Id. § 401(m)(2)(B), 117 Stat. 650, 675 (2003)(codified as amended at 28 U.S.C. § 994 (2006)).]   Under a fast-track program, the defendant receives a downward departure of 1 to 4 levels if they accept an early plea.   [Id.]   In the District of New Mexico, a defendant charged with the felony of illegal re-entry could get a three-level departure if he has not committed a violent crime.   [U.S. Sentencing Commission Guidelines Manual (2013), http://www.ussc.gov/sites/default/files/pdf/guidelines-manual/2013/manual-pdf/2013_Guidelines_Manual_Full.pdf (hereinafter Guidelines Manual)].   If he had committed a violent crime in his past, he could still get a one-level departure. [Id.]
>
> As an example of the pre-fast-track sentencing structure, if the defendant was here illegally and committed a drug-trafficking crime in 2003, his base offense level would be at 8 for the crime of re-entry with a 12-level enhancement for the drug trafficking crime.   [Id.]   His offense level of 20 would have been reduced three levels if he accepted responsibility, leaving him with an offense level of 17.   [Id.]   With a criminal history at level II, the guideline range for his sentence would have been 27 to 33 months.   [Id.]   When the judicial author of this Article came onto the bench in 2003 before Blakely v. Washington, [See Blakely v. Washington, 542 U.S. 296 (2004)] and United States v. Booker, [See 543 U.S. 220 (2005),] which turned the previously mandatory sentencing guidelines into advisory sentencing guidelines, the criminal offender mentioned above would have received a sentence of 27 months.

Starting on October 24, 2003, the District of New Mexico began following the fast-track program.  [Memorandum from James B. Comey, Deputy Attorney General, U.S. Dep't Justice, Authorization of Early Disposition Programs (Oct. 29, 2004), reprinted in 21 Fed. Sent. Rptr. (Vera) 322, 323 (2009).]  Under the fast-track program, the same defendant as above would have received an extra three-level downward departure for accepting the plea early.  [Guidelines Manual, supra.]  As a result, his offense level would have been reduced to 14, and with a criminal history at level II, the guideline range would call for a sentence between 18 and 24 months.  [Id.]

Then, in early 2012, the DOJ decided to standardize the fast-track programs across all districts.  [Memorandum from James M. Cole, Deputy Attorney General, U.S. Dep't Justice, Department Policy on Early Disposition or "Fast-Track" Programs (Jan. 31, 2012), available at http://www.Justice.gov/dag/fast-track-program.pdf.]  If a U.S. Attorney wants to implement a fast-track program, he or she has to use the one the DOJ drafts.  [Id.]  Before this, the U.S. Attorney for each district could tailor the program he or she implemented to the individual district.  For the District of New Mexico, this individualization meant that the same defendant as above would no longer get a four-level downward departure, but instead would get only the three-level departure implemented in 2003.  With an offense level of 13 and criminal history still at II, the sentence range for this particular post-2012 defendant would now be between 15 and 21 months.  The District went from a typical sentence of 27 months in early 2003 to a 15-month sentence in 2013.

Adding some complexity to the discussion is that some districts can and do choose to not implement a fast-track program at all.  [See id.]  As a result, sentences in the District of New Mexico tend to be lower than the sentences in those districts.  Moreover, in some districts, not every defendant would be charged with a felony.  In fact, most are charged with misdemeanors, so those other districts charging misdemeanor will likely impose shorter sentences than New Mexico's felony sentences.  There has been a steady downward pressure on sentences for illegal re-entry, especially in the border districts, but it is possible that in non-fast-track districts, the prosecutor's decision to charge the illegal immigrant with a misdemeanor or felony could place them either below or above the sentence she or he would receive in New Mexico.

In fact, outside the border districts, such as in the Northern District of Texas, some of the judges can give sentences that are twice as long as those given out in New Mexico for similar re-entry crimes.  For example, the judicial author once had a defendant in front of him who was sentenced to 96 months by a Northern District of Texas judge, but in New Mexico he ended up getting sentenced to 18 months.  [United States v. Calderon-Ramirez, CR 07-2066 JB, 2008 WL 2397661 (D.N.M. Jan. 30, 2008).]

It has been the policy of the judges of the District of New Mexico that they sentence a re-entry defendant to time as soon as possible. This policy is exhibited in a number of different ways. The District stations two district judges in Las Cruces, New Mexico. [See District of New Mexico Judges, U.S. District Court, District of New Mexico, http://www.nmcourt.fed.us/web/DCDOCS/files/judges.html (last visited Aug. 23, 2013).] It places nearly a third of the District's seven active judges in Las Cruces. Moreover, having judges travel there to conduct sentencing in Las Cruces sentences people faster and is more cost efficient than moving those defendants to Albuquerque.

The District also stations five Magistrate Judges in Las Cruces. [See id.] That means that more than half of the nine[11] Magistrate Judges in the District are located near the border. While Magistrate Judges can handle some tasks on a felony case, only a District Judge can try a felony case and, perhaps more important in this context, only a District Judge can sentence a convicted felon. [28 U.S.C. § 636(a).] The nation also sends visiting judges from other Districts to sit in Las Cruces, and the District Judges from the north frequently go to Las Cruces.

Civil lawyers may often wonder as they wait months for a decision from a District Judge to come out in a civil case, what it is a Federal judge does with his or her time. It is important to recognize, however, the impact the sheer number of illegal re-entry cases have on the resolution of every other civil and criminal case as well. Even the northern judges in Albuquerque and Santa Fe, who are not sentencing as many re-entry cases as the judges in Las Cruces,[12] are sentencing many difficult re-entry cases. [Id.] Some of these more difficult sentences are because the defendants have complex and complicated criminal histories, so the defendant is not looking at time-served sentences, but long, contested sentences. Even when the court is not sentencing in a re-entry case, the volume of re-entry cases makes it difficult to get to other criminal cases, such as those arising in Albuquerque's metropolitan area and on the 22 Native American reservations and

---

[11]The District now has ten Magistrate Judges -- five in Las Cruces and five in Albuquerque.

[12]Memorandum from Matthew J. Dykman, Clerk of Court District of New Mexico, to the Honorable James O. Browning, Federal Judge District of New Mexico (Nov. 6, 2014)(on file with authors)(outlining the routine transfer of defendants who are charged with illegal reentry with a maximum sentence of 10 years or more given their prior criminal record to Federal District Court in Albuquerque. In 2012, 349 such reentry cases were transferred to Albuquerque; in 2013, 419 such transfers occurred; and through Oct. 31, 2014, 421 such transfers have occurred in 2014.).

pueblos in the District.  New Mexico is not a sleepy backwater place when it comes to federal crime.  It has the fourth highest number of criminal fillings per Federal Judge out of the 94 Federal Districts in the nation.  [See U.S. District Courts-Weighted and Unweighted Filings per Authorized Judgeship During the 12-Month Period Ending September 30, 2012, U.S. Courts, http://www.uscourts.gov/uscourts/Statistics/JudicialBusiness/2012/appendices/X01ASep12.pdf (last visited Aug. 23, 2013).]  New Mexico's 179.5-mile-long border with Mexico, [Janice Cheryl Beaver, Cong. Research Serv., U.S. International Borders: Brief Facts 2 (2006), http://www.fas.org/sgp/crs/misc/RS21729.pdf (last visited Aug. 31, 2013),] and three Native American reservations and 19 pueblos, [See Pueblos and Reservations, Albuquerque Convention & Visitors Bureau, http://www.itsatrip.org/albuquerque/culture-heritage/native-american/pueblos-reservations.aspx (last visited Aug. 31, 2013),] provide for a robust federal docket.

James O. Browning & Jason P. Kerkmans, <u>A Border Trial Judge Looks at Immigration: Heeding the Call to Do Principled Justice to the Alien Without Getting Bogged Down in Partisan Politics: Why the U.S. Immigration Laws Are Not Broken (but Could Use Some Repairs</u>, 25 U. Fla. J.L. & Pub. Pol'y 223, 258-60 (2014).

Hence, there is still really no "nationwide" fast-track program; if a U.S. Attorney wants a fast-track plea, he or she can no longer tailor or customize one, and must take the off-the-shelf one that main Department of Justice has devised, but no U.S. Attorney has to have one.  Thus, there is built-in disparity from the fast-track program.  Defendants in some districts do not get the benefit of a fast track, while defendants coming into New Mexico do.  As many judges correctly point out, New Mexico defendants are known to get lighter sentences than elsewhere in the nation.  Judges' sentencing policies vary in the district.  Hence, it is very difficult in the nation, or even in the district, to avoid sentencing disparities among similarly situated defendants who have been found guilty of such reentry crimes.

Here, the Court gave Martinez a Guidelines sentence.  It gave him the same sentence that the Western District of Texas previously gave him in 2011.  These are good ways to avoid

disparities.  Martinez chose what district to enter, and illegal aliens are often knowledgeable about which districts have which sentencing policies.  Assignments in the district are random, and the sentencing practices vary.  Judges talk to each other and others, and New Mexico judges know that their re-entry sentences are often lower than the rest of the nation and some are troubled by the low sentences that the fast track program creates for repeat offenders.  In any case, while there may be a bit of randomness in the assignment of a case, Martinez can rest assured that his sentence is not random nor arbitrary, but the product of extremely hard work.

In sum, as this Memorandum Opinion and the three sentencing hearings reflect, the Court has carefully considered the Guidelines, but in arriving at its sentence, the Court has taken account, not only of the Guidelines, but all the sentencing goals.  Specifically, the Court has considered the Guidelines' sentencing range established for the applicable category of offense committed by the applicable category of defendant.  After carefully considering Martinez' request for an 8-month, or ultimately a sentence at or below the low-end of the guidelines range of 18 to 24 months, the Court concludes that the proposed below-Guidelines sentences are not appropriate and that the punishment set forth in the Guidelines is most appropriate.  The Court has also considered the kinds of sentences and range that the Guidelines establish.  After careful consideration of all the § 3553(a) factors, and the case's circumstances, and the defendant's history and characteristics, the Court concludes that a sentence of 24 months is necessary to reflect the offense's seriousness, promote respect for the law, provide just punishment, afford adequate deterrence -- both at a specific and general level -- protect the public,[13] avoid

---

[13]The Court is troubled that Martinez came to the United States illegally and then killed a man.  He has provided no information to support his story.  Perhaps it was a different time in 1998, but the story is so different that it concerns the Court what happened.

unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and, because Martinez will be deported as soon as he completes his incarceration, and because the Court does not think that more "unsupervised" supervised release is appropriate here.  The Court thinks that promoting respect for the law, providing just punishment, and deterrence are particularly important factors in Martinez' case given the number of times he has tried to come to the United States and has come.  The Court concludes that this 24-month sentence reflects fully each relevant factor established in 18 U.S.C. § 3553(a).  The Court has worked hard to craft a reasonable sentence and one that accurately reflects the § 3553(a) factors.  Finally, the Court concludes that the sentence is sufficient, but not greater than necessary, to comply with the purposes of punishment set forth in the Sentencing Reform Act.

**IT IS ORDERED** that: (i) the requests in Mr. Martinez' Sentencing Memorandum, filed May 1, 2015 (Doc. 16), are denied; (ii) Defendant Jose Eriberto Martinez is sentenced to 24-months imprisonment for the re-entry crime in this case; and (iii) Martinez is sentenced to 4-months imprisonment for violating the terms of his supervised release, with 3 months to run concurrently to the 24-month sentence imposed for the re-entry crime and one month to run consecutively.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

David P. Martinez
  United States Attorney
Presiliano A. Torrez
Samuel Hurtado
Norman Cairns
  Assistant United States Attorneys
Albuquerque, New Mexico

      *Attorneys for the United States*

Marc H. Robert
  Assistant Federal Public Defender
Albuquerque, New Mexico

      *Attorney for the Defendant*